06-5703-mv
Pew v. Cardarelli

**UNITED STATES COURT OF APPEALS**

**FOR THE SECOND CIRCUIT**

August Term, 2006

(Argued: April 24, 2007          Decided: May 13, 2008)

Docket No. 06-5703-mv

- - - - - - - - - - - - - - - - - - - - - -x

ESTATE OF BARBARA PEW (DECEASED), JOHN
PEW, JR., INDIVIDUALLY AND AS EXECUTOR
OF THE ESTATE OF BARBARA E. PEW, HAROLD
PEW, DONNA PEW, H. NANCY HANN, JULIA
HUDASKY and KATHLEEN PRICKETT, on behalf
of themselves and all others similarly
situated,

                    Plaintiffs-Respondents,

          - v.-

DONALD P. CARDARELLI, PETER J. O'NEILL
and PRICEWATERHOUSECOOPERS LLP,

                    Defendants-Petitioners.

- - - - - - - - - - - - - - - - - - - - - -x

     Before:          JACOBS, Chief Judge, KEARSE and POOLER,
                      Circuit Judges.


     Judge Pooler dissents in a separate opinion.


     On this petition for leave to appeal an order of the

United States District Court for the Northern District of

New York (Mordue, C.J.), which granted plaintiffs' motion to remand this action to New York State Supreme Court, we conclude that the action falls within the grant of federal jurisdiction in the Class Action Fairness Act. Consequently, we have authority to accept jurisdiction to review the district court's order.  We elect to exercise jurisdiction and, on the merits, we reverse the remand order.

For Plaintiffs-Respondents   ROBERT I. HARWOOD (James Flynn, on the brief), Wechsler Harwood LLP, New York, NY.

HAROLD G. COHEN, Dilworth Paxson LLP, Cherry Hill, NJ.

STUART SAVETT (James J. Rodgers, on the brief), Dilworth Paxson LLP, Philadelphia, PA.

DAVID M. GARBER, Mackenzie Hughes LLP, Syracuse, NY.


For Defendants-Petitioners   PHILIP D. ANKER (Peter K. Vigeland, Matthew M. Graves, on the brief), Wilmer Cutler Pickering Hale and Dorr LLP, New York, NY.

JAMES J. CAPRA, JR. (Matthew L. Craner, Alison F. Swap, on the brief), Orrick, Herrington & Sutcliffe LLP, New York, NY.

DENNIS JACOBS, Chief Judge:

This case construes certain provisions of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of Title 28, United States Code). One purpose of CAFA is to provide a federal forum for securities cases that have national impact, without impairing the ability of state courts to decide cases of chiefly local import or cases that concern traditional state regulation of the state's corporate creatures. CAFA does that by expanding federal diversity jurisdiction, by allowing removal of securities cases of national impact from the state courts, and by conferring appellate jurisdiction to review orders granting or denying motions to remand such removed cases.

This putative class action was commenced in New York State Supreme Court, and was removed to the United States District Court for the Northern District of New York (Mordue, C.J.). The action alleges that officers of an issuer--abetted by the issuer's auditor--failed to disclose, while marketing certain debt certificates, that the issuer was insolvent. Plaintiffs seek relief under New York's consumer fraud statute. The main question for this appeal is whether such a claim falls within an exception to CAFA's

grant of original and appellate jurisdiction--for class actions that solely involve claims that "relate[] to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security."  28 U.S.C. § 1332(d)(9)(C); id. § 1453(d)(3).  This is a question of first impression in the circuit courts.

Although the matter is not entirely clear given the imperfect wording of the statute, we hold that the present suit does not fall within this exception to CAFA jurisdiction.  Consequently, we have authority to accept an appeal from the district court's order granting plaintiffs' motion to remand this action to the state court.  We elect to grant defendants' petition for permission to appeal and, on the merits, we reverse the district court's remand order.

                              **I**

Agway, Inc., an agricultural supply and marketing cooperative, sought to raise capital by issuing money market certificates ("Certificates")--unsecured, fixed-interest debt instruments.  Later, Agway suspended sale of the Certificates, and ended its practice of repurchasing them prior to maturity.  Agway filed for bankruptcy in September

4

2002. This is the second litigation brought by these plaintiffs over these Certificates.

The 2003 Lawsuit. Plaintiffs, seeking to represent a class of individuals who purchased the Agway Certificates between September 2000 and September 2002, filed a lawsuit in New York Supreme Court against Agway officers Donald P. Cardarelli and Peter J. O'Neill, as well as Agway's auditor, PriceWaterhouseCoopers, LLP ("defendants"). That complaint was predicated on the federal securities laws--in particular, § 11(a) of the Securities Act of 1933, 15 U.S.C. § 77k(a)--and it asserted that misrepresentations in Agway's financial statements fraudulently concealed that Agway was insolvent and could only discharge its previous debt through the issuance of new debt instruments.

Defendants removed the action to the United States District Court for the Northern District of New York. Plaintiffs then amended the complaint to plead essentially the same acts of concealment under New York's consumer fraud law, which creates a private right of action for victims of "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service," N.Y. Gen. Bus. Law § 349(a). See id. § 349(h).

5

As to the federal securities claim, Judge Mordue granted defendants' motion to dismiss with prejudice. See Pew v. Cardarelli, No. 5:03-cv-742, 2005 WL 3817472, at *7 (N.D.N.Y. Mar. 17, 2005). Judge Mordue declined to exercise supplemental jurisdiction over plaintiffs' state law claim, dismissing without prejudice. Id. at *16. We affirmed by summary order, ruling that "no reasonable investor could have been misled about the nature and extent of the risks associated with investing in Agway Certificates." Pew v. Cardarelli, 164 Fed. App'x 41, 44 (2d Cir. 2006) (summary order).

The 2005 Lawsuit. The present lawsuit, filed in New York Supreme Court, makes essentially the same factual allegations, but seeks relief only under the state consumer fraud statute, N.Y. Gen. Bus. Law § 349. Defendants removed the action to federal court under CAFA, which in some circumstances permits removal of class actions based wholly on state law. Plaintiffs moved to remand the case to state court, arguing that their suit falls within an exception to CAFA's removal provision for actions "that relate[] to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security," and

6

that the district court therefore lacks jurisdiction over it, 28 U.S.C. § 1332(d)(9)(C), and cannot accede to removal, id. § 1453(d)(3).  Chief Judge Mordue agreed, and remanded. Estate of Pew v. Cardarelli, No. 5:05-cv-1317, 2006 WL 3524488 (N.D.N.Y. Dec. 6, 2006).

Defendants filed the present petition pursuant to 28 U.S.C. § 1453(c), seeking permission to appeal the district court's remand order.  We advised the parties that were we to grant defendants' motion for leave to appeal, we might also elect to decide the merits simultaneously.

**II**

CAFA requires that any petition for review of an order granting or denying a motion to remand be made to the court of appeals "not less than 7 days after entry of the order." 28 U.S.C. § 1453(c)(1) (emphasis added).  As the Third Circuit concluded, this is surely a typographical error, because the "uncontested legislative intent behind § 1453(c) was to impose a seven-day deadline for appeals," not a waiting period.  Morgan v. Gay, 466 F.3d 276, 277 (3d Cir. 2006) (emphasis added).  We join our sister circuits in interpreting the statute to mean "not more than 7 days."

7

Id.; see also Miedema v. Maytag Corp., 450 F.3d 1322, 1326 (11th Cir. 2006) (reaching same interpretation); Amalg. Transit Union Local 1309 v. Laidlaw Transit Servs., Inc., 435 F.3d 1140, 1146 (9th Cir. 2006) (same); Pritchett v. Office Depot, Inc., 420 F.3d 1090, 1093 n.2 (10th Cir. 2005) (same). Defendants' petition is timely because it was filed on the seventh business day after the entry of the district court's order.

**III**

Ordinarily, an order of remand is unappealable. See 28 U.S.C. § 1447(d). Plaintiffs argue that we lack jurisdiction to decide the present appeal because defendants failed to make a timely application to the district court to stay its order of remand. Section 1453 conditions the right of appeal on a timely filing, without mention of a stay. See 28 U.S.C. § 1453(c)(1). We therefore hold that in granting the federal courts of appeals jurisdiction to review remand orders "notwithstanding section 1447(d)," Congress did not require a defendant to seek a stay. Id. § 1453(c)(1).

**IV**

Plaintiffs contend that we lack appellate jurisdiction to review the order of remand, by virtue of 28 U.S.C. § 1453(d)(3).

As always, we have jurisdiction to determine our jurisdiction.  See Kuhali v. Reno, 266 F.3d 93, 100 (2d Cir. 2001).  Section 1453 provides, in pertinent part:

> (b) In general.--A class action may be removed to a district court of the United States . . . without regard to whether any defendant is a citizen of the State in which the action is brought . . . .
>
> (c) Review of remand orders.--
>
>> (1) In general.--Section 1447 shall apply to any removal of a case under this section, except that notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order.
>>
>> (2) Time period for judgment.--If the court of appeals accepts an appeal under paragraph (1), the court shall complete all action on such appeal, including rendering judgment, not later than 60 days after the date on which such appeal was filed . . . .
>
> (d) Exception.--This section shall not apply to any class action that solely involves--
>
>> . . .

> (3) a claim that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security . . . .

As explained in detail _infra_, § 1453(d)(3) mirrors § 1332(d)(9)(C), which provides an exception to CAFA's grant of original federal jurisdiction.

Subsection (b) permits defendants (who are New York residents) to remove the action from New York Supreme Court. Subsection (c) gives defendants the right to petition this Court for an appeal of the district court's remand order. _Compare_ 28 U.S.C. § 1447(d) ("An order remanding a case to the State court from which it was removed is not reviewable on appeal or otherwise . . . .").

The plain language of subsection (d) ("This _section_ shall not apply . . . ." (emphasis added)) limits all of § 1453, including subsection (c), which delineates the scope of our authority to "accept an appeal" from a remand order. Therefore, § 1453(d) limits our jurisdiction to review the district court's remand order.[1]

---

[1]It may seem odd that Congress would confine appellate jurisdiction to review a remand order to precisely the same boundaries used to limit the district court's original jurisdiction; but the § 1453(d) exceptions are not the only exceptions to CAFA's expansion of federal jurisdiction--and the other exceptions do not purport to double as limitations

Within our bounded appellate jurisdiction we nevertheless retain discretion to decline to hear such appeals. Section 1453(c) provides that "a court of appeals _may_ accept an appeal from an order of a district court granting or denying a motion to remand . . . ." 28 U.S.C. § 1453(c)(1) (emphasis added). A sound exercise of discretion will be guided by consideration of the importance and novelty of the issues raised by the case. See, e.g., Hart v. FedEx Ground Package Sys. Inc., 457 F.3d 675, 678 (7th Cir. 2006) (exercising discretion to accept an appeal to "address [an] important question" under CAFA). Here, we elect to entertain defendants' appeal because the question of whether a state-law deceptive practices claim predicated on the sale of a security is removable under CAFA is important and consequential, and a decision of the question will alleviate uncertainty in the district courts.

Lastly, because we grant defendants' petition for leave to appeal, see infra, we also elect to decide the merits of

on appellate jurisdiction. See, e.g., 28 U.S.C. § 1332(d)(5)(A) (excepting from CAFA's grant of original jurisdiction any class action in which "the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief").

the appeal simultaneously. This approach finds support in the caselaw, see, e.g., Wallace v. La. Citizens Prop. Ins. Corp., 444 F.3d 697, 701 n.5 (5th Cir. 2006) ("Although this case comes to us as a petition to accept the appeal, the parties sufficiently address the basis for the underlying appeal, thus allowing us to rule on the merits."), and it is permitted by the Federal Rules of Appellate Procedure, see Fed. R. App. P. 2. Plaintiffs urge us to decide now only the motion for leave to appeal, and decide the merits later. That course would be inefficient because in order to decide whether we have appellate jurisdiction we must construe the same statutory language upon which the district court rested its remand order (and because the parties have already briefed their positions on that virtually identical statute). Moreover, once leave to appeal is granted, the Court has only 60 days to render a decision. See DiTolla v. Doral Dental IPA of N.Y., LLC, 469 F.3d 271, 275 (2d Cir. 2006) ("CAFA's 60-day clock for rendering judgment starts running on the day that the Court's order granting permission to appeal is filed."). Rather than spin wheels, we elect to decide the merits of the appeal now.

**V**

To determine whether the district court properly remanded to state court (and whether we lack appellate jurisdiction under § 1453(c)), we must consider an exception to CAFA's grant of original federal jurisdiction, for "any class action that solely involves a claim . . . that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security." 28 U.S.C. § 1332(d)(9)(C). If plaintiffs' state-law consumer fraud claim falls within this exception, the district court lacks jurisdiction and properly remanded the case to state court (and we lack appellate jurisdiction to review that determination).

We first look to the statute's plain meaning; if the language is unambiguous, we will not look farther. See Connecticut Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992). Here, because the imperfect drafting of the statute makes it ambiguous, we read the wording, consider the statutory context, and consult the legislative history. And we conclude that all modes of analysis agree.

CAFA amends the diversity jurisdiction statute by adding § 1332(d), which confers original federal

13

jurisdiction over any class action with minimal diversity (e.g., where at least one plaintiff and one defendant are citizens of different states) and an aggregate amount in controversy of at least $5 million (exclusive of interest and costs). See 28 U.S.C. § 1332(d)(2). However, "to keep purely local matters and issues of particular state concern in the state courts," Lowery v. Alabama Power Co., 483 F.3d 1184, 1194 (11th Cir. 2007), Congress excluded from CAFA's expanded jurisdiction (inter alia) certain securities-related class actions, described in three subsections (set out in the margin).[2] Subsection (A) of § 1332(d)(9) carves

[2]Section 1332(d)(9) provides:

Paragraph (2) [granting district courts original jurisdiction over such class actions] shall not apply to any class action that solely involves a claim--

(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or

14

out class actions for which jurisdiction exists elsewhere under federal law, such as under the Securities Litigation Uniform Standards Act ("SLUSA"), i.e., state-law fraud claims in connection with the purchase or sale of securities traded on a national stock exchange, see 15 U.S.C. § 78bb(f); § 77r(b)(1)).  Subsection (B) of § 1332(d)(9) carves out class actions that are within the states' purview of corporate law and governance.  It is undisputed that the exception to federal jurisdiction in subsection (A) of § 1332(d)(9) is inapplicable here because the Certificates are not traded nationally, nor are they listed on any national securities exchange.  Likewise, subsection (B) of § 1332(d)(9) is inapplicable because plaintiffs' claims do not concern corporate governance.

The bone of contention is subsection (C) of § 1332(d)(9), which carves out any class action

> that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities

> created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

15

Act of 1933) and the regulations issued thereunder).

As explained supra, the same wording is used in § 1453(d)(3), which provides an exception to defendants' power to remove an action, see 28 U.S.C. § 1453(b), and an exception to our jurisdiction to review a district court's remand order, see id. § 1453(c). Thus CAFA's jurisdictional and removal provisions operate in tandem. If there is original jurisdiction for plaintiffs' underlying claim, we have appellate jurisdiction, we reverse the remand order, and this action remains in federal district court. If the district court lacked jurisdiction over the underlying claim, we would dismiss the appeal for lack of appellate jurisdiction, the remand order would stand, and the action would be consigned to state court. Accordingly, both original and appellate jurisdiction depend on whether plaintiffs' allegations fall within CAFA's exception for claims that relate to rights, duties and obligations related to or created by or pursuant to a security.

To aid analysis, it is useful to break down the wording of § 1332(d)(9)(C) and § 1453(d)(3) into numbered phrases as follows:

[i]      [Section 1332(d)(2) and section 1453(b) and

16

(c)] shall not apply to any class action that solely involves a claim . . . that relates to

[ii]        the rights, duties (including fiduciary duties), and obligations

[iii]       relating to or created by or pursuant to

[iv]        any security . . . .

The sentence as a whole cannot be read to cover any and all claims that relate to any security, because that would afford no meaning to [ii] and [iii], which are evidently terms of limitation.  If the limitation is to rights, duties and obligations (those that relate to, are created by or arise pursuant to a security), what are those rights, duties and obligations?

The statute gives clues as to the import of each term. The word "duties" expressly includes "fiduciary duties," which reinforces the common understanding that duties are owed by persons (whether human or artificial). "Obligations" can be owed by persons <u>or</u> by instruments, but the natural reading of this statutory language is to differentiate obligations from duties by reading obligations to be those created in instruments, such as a certificate of incorporation, an indenture, a note, or some other corporate document.  And certain duties and obligations of course

17

"relate to" securities even though they are not rooted in a corporate document but are instead superimposed by a state's corporation law or common law on the relationships underlying that document.  Finally, the "rights" are those of the security-holders (or their trustees or agents) to whom these duties and obligations run.  Thus, an instrument that creates an obligation generates a corresponding right in the holder.

Plaintiffs argue (and the dissent essentially agrees) that the term "rights . . . relating to . . . any security" includes the right to bring any cause of action that relates to a security.  But this would defeat any limitation that was intended by the use of the term.  Moreover, this interpretation would render superfluous § 1332(d)(9)(A) (excepting class actions "concerning a covered security") and § 1453(d)(1) (same), because all "covered securities" are (of course) "securities."  See 28 U.S.C. § 1332(d)(9)(C) (excepting suits relating to rights, duties and obligations relating to or created by or pursuant to "any security").

The Agway Certificates--which the parties agree are "securities" under CAFA--certainly create "obligations," and therefore corresponding "rights" in the holders.  For

18

example, the Certificates create rights in the holders to a rate of interest and to principal repayment at certain dates.  But the present suit does not "relate[] to" those rights; rather, it is a state-law consumer fraud action alleging that Agway fraudulently concealed its insolvency when it peddled the Certificates.  Claims that "relate[] to the rights . . . and obligations" "created by or pursuant to" a security must be claims grounded in the terms of the security itself, the kind of claims that might arise where the interest rate was pegged to a rate set by a bank that later merges into another bank, or where a bond series is discontinued, or where a failure to negotiate replacement credit results in a default on principal.  The present claim--that a debt security was fraudulently marketed by an insolvent enterprise--does not enforce the rights of the Certificate holders as holders, and therefore it does not fall within § 1332(d)(9)(C) and § 1453(d)(3).

Our interpretation arguably renders the words "relating to" superfluous.  But forced as we are to construe "CAFA's cryptic text," Lowery, 483 F.3d at 1187, we prefer an interpretation that preserves the meaning of an entire subsection.  In any event, the words "relating to" are

19

repetitive and lack any predictable or precise effect. See 28 U.S.C. § 1332(d)(9)(C) (excepting from federal jurisdiction any class action solely involving a claim "that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security") (emphases added).

"Interpretation of a word or phrase depends upon reading the whole statutory text[ and] considering the purpose and context of the statute . . . ." Dolan v. U.S. Postal Serv., 546 U.S. 481, 486 (2006). Review of SLUSA and CAFA confirms an overall design to assure that the federal courts are available for all securities cases that have national impact (including those that involve securities traded on national exchanges), without impairing the ability of state courts to decide cases of chiefly local import or that concern traditional state regulation of the state's corporate creatures:

- Thus, although SLUSA bars state-law class actions from all courts if the class alleges a fraudulent statement or omission or manipulative device in connection with the purchase or sale of a security traded on a national exchange, see 15 U.S.C. §

20

77p(b), it carves out an exception for actions that are based on the law of the state in which the issuer is incorporated or organized and that concern transactions with or communications to persons who already hold the securities of the issuer, see id. § 77p(d)(1)(A)-(B), thereby creating concurrent jurisdiction in cases that are likely to have both national and local impact.

- CAFA's amendments to the diversity statute-- including its exceptions--proceed along similar lines, granting federal courts jurisdiction over all class actions (with regard to securities and otherwise) over $5 million in the aggregate if the class members are largely out of state, see 28 U.S.C. § 1332(d)(3), (4). Reading the provisions in context, we infer that diversity jurisdiction is created under CAFA for all large, non-local securities class actions, subject to the three exceptions discussed above.

The legislative history confirms our reading of CAFA.

See S. Rep. No. 109-14, at 45 (2005), reprinted in 2005 U.S.C.C.A.N. 3, 42-43. This Circuit has expressed some skepticism as to the "probative value" of the Senate Report because it was issued after CAFA's enactment (by ten days). Blockbuster, Inc. v. Galeno, 472 F.3d 53, 58 (2d Cir. 2006). However, as the Eleventh Circuit has pointed out, the Report "was submitted to the Senate on February 3, 200[5]--while that body was [still] considering the bill." Lowery, 483 F.3d at 1206 n.50 (emphasis added) (citing 151 Cong. Rec. S909, 978 (daily ed. Feb. 3, 2005)). We therefore think it appropriate in this case to examine the legislative history of these particularly knotty provisions.

Certain passages from the Senate Judiciary Committee Report speak directly to the issue here:

> [T]he Act excepts from . . . [its grant to the district courts of original] jurisdiction those class actions that solely involve claims that relate to matters of corporate governance arising out of state law. . . . By corporate governance litigation, the Committee means only litigation based solely on . . . the rights arising out of the terms of the securities issued by business enterprises.
>
> . . .
>
> The subsection 1332(d)(9) exemption to new section 1332(d) jurisdiction is also intended to cover disputes over the meaning of the terms of a security, which is generally spelled out in some formative document of the business enterprise, such as a certificate of

22

incorporation or a certificate of designations. S. Rep. 109-14, at 45 (emphases added). These passages demonstrate that Congress intended that § 1332(d)(9)(C) and § 1453(d)(3) should be reserved for "disputes over the meaning of the terms of a security," such as how interest rates are to be calculated, and so on. This is entirely consistent with our interpretation of § 1332(d)(9)(C) and § 1453(d)(3) as applying only to suits that seek to enforce the terms of instruments that create and define securities, and to duties imposed on persons who administer securities.

## CONCLUSION

For the foregoing reasons, we have appellate jurisdiction to review the district court's remand order. Furthermore, we grant defendants leave to appeal, reverse the district court's remand order, and remand the case to the district court for further proceedings.

23

POOLER, Circuit Judge, dissenting:

The majority opinion misconstrues the plain language of a statute and reaches an incorrect result. Because I believe we are bound by the text of the enactment, I am constrained, respectfully, to dissent.

We are called upon in this case to apply certain provisions of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.). There is no dispute that CAFA's general purpose is to significantly expand federal court jurisdiction over multistate class action litigation. As United States District Judge Sarah S. Vance, of the Eastern District of Louisiana, has commented, "CAFA represents the largest expansion of federal jurisdiction in recent memory." Sarah S. Vance, A Primer on the Class Action Fairness Act of 2005, 80 Tul. L. Rev. 1617, 1643 (2006). CAFA, however, contains certain exceptions to the expansion of federal jurisdiction over multistate class actions. I believe that one of these exceptions, by its plain terms, is applicable to the instant case. By

24

contrast, the majority appears to believe that CAFA contains little in the way of plain terms. That is, we are told of "the imperfect wording of the statute," Opinion at 4; it is asserted that "the imperfect drafting of the statute makes it ambiguous," id. at 13; and that we are "forced . . . to construe 'CAFA's cryptic text,'" id. at 19 (quoting Lowery v. Alabama Power Co., 483 F.3d 1184, 1187 (11th Cir. 2007)). But I fear that a reader of the majority's opinion must be forgiven if he or she comes to the conclusion that the generally opaque quality of CAFA has been merely asserted rather than demonstrated. More importantly, with respect to the specific provision of CAFA that I believe governs this case, I expect that this reader may conclude that the majority has simply departed from the statutory text in favor of a dubious consideration of the supposed legislative intent of the statute's drafters. Accordingly, and respectfully, I am compelled to dissent.

**I.   The Applicability of 28 U.S.C. Section 1332(d)(9)(C).**

I agree with the majority that the central issue

25

on this appeal is the exception, now codified at 28 U.S.C. Section 1332(d)(9), which states that CAFA's broad grant of federal court jurisdiction over multistate class action litigation "shall not apply to any class action that solely involves a claim

>          (A)  concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

>          (B)  that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized, or

>          (C)  that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder). "

I agree with the majority that the exemption to federal jurisdiction set forth in 28 U.S.C. Section 1332(d)(9)(A) is not applicable here.  That provision's reach is expressly

26

limited to claims involving "covered securit[ies] as defined under 16(f)(3) of the Securities Act of 1933."  As recognized by the district court, "covered securities" as defined by the Securities Act are "securities that are traded nationally or listed on a regulated national exchange.  See 15 U.S.C. § 77r(b), cited in 15 U.S.C. §§ 77p(f)(3); 78bb(f)(5)(E)."  Pew v. Cardarelli, 2006 WL 3524488 at *5 (N.D.N.Y. 2006).  There is no assertion by either of the parties that the Agway Certificates are traded nationally, nor that they are they listed on any national securities exchange.

I also agree with the majority regarding the inapplicability of Section 1332(d)(9)(B).  That section speaks of suits relating to "the internal affairs or governance" of the firm against which the suit is brought. The claims asserted by the plaintiffs here only go to the integrity of their investment in the Agway Money Market Certificates ("the Certificates"); they do not seek to alter the course of Agway's management.  Our disagreement is therefore over the proper construction of the terms of 28

27

U.S.C. Section 1332(d)(9)(C).

The majority correctly asserts that Section 1332(d)(9)(C) "cannot be read to cover any and all claims that relate to any security . . . ." Opinion at 17. For example, as the defendants argue, if Congress had intended for "a standard misrepresentation claim to come within § 1332(d)(9)(C), it could have simply provided that the exception applied to any claim relating to 'a security' (or relating to 'the purchase or sale of a security'). There would have been no need for Congress to add the words that the exception applies only to a claim relating to '<u>the rights, duties . . . and obligations relating to or created by or pursuant</u> to any security.'" Defts.' Br. at 12-13 (emphasis in original). If we examine the securities at issue in this case, however, it is readily apparent that the instant suit in fact relates to rights and obligations created by, or at least relating to, those securities.

The majority correctly identifies the Certificates as "unsecured, fixed-interest debt instruments." Opinion at 4. More specifically, the plaintiffs assert that, by issuing

28

the Certificates, Agway undertook the obligation to repay purchasers' principal at maturity dates between October 31, 1998 and October 31, 2013, and to pay interest until maturity at stated rates between 4.5% and 9.5%.  Complaint ¶ 63.[1]  The plaintiffs' central allegation is that Agway had degenerated into "a classic 'Ponzi' scheme" which could only meet its ongoing payment obligations to holders of the Certificates through the irresponsible issuance of new Certificates.  Complaint ¶¶ 2, 3.  The complaint alleges that

> Agway was insolvent from the beginning of the Class Period, because the value of its assets during that time . . . was insufficient by several hundred million dollars to discharge its Money Market-Certificate-related liabilities, and the only substantial liquid source of funds available to discharge the hundreds of millions of dollars of Money Market Certificates sold and maturing during and after the Class Period was other peoples' money – from the sale of hundreds of millions of dollars of new Money Market Certificates to plaintiffs and other unsuspecting investors.

---

[1]  Citations to the complaint refer to the state court complaint, filed on September 22, 2005, in the Supreme Court of the State of New York for the County of Onondaga.

29

Complaint ¶ 3 (emphases in original). Thus, it is alleged that Agway fraudulently concealed the fact that it could not meet its unqualified obligations with respect to the Certificates, i.e., that the plaintiffs were fraudulently deprived of their right to repayment of the principle component of their investment:

> [T]he new Money Market Certificates purchased by plaintiffs . . . had no possibility of ever being fully repaid. To the contrary, aside from the money of plaintiffs and other hapless investors, . . . the only possible source for Agway's satisfaction of any portion of the principal amount of the new Money Market Certificates . . . was the dismantling and sale of Agway's most valuable remaining business segments . . . . But these valuable assets would never be available in connection with the more distant maturities of the new Money Market Certificates . . . because the assets would have to be disposed of to meet Agway's presently existing obligations with respect to the hundreds of millions of dollars of previously sold Money Market Certificates maturing during and shortly after the Class Period.

Complaint ¶ 5 (emphases in original).

In light of these allegations, the applicability of the

Section 1332(d)(9)(C) exemption appears to me to be obvious. By issuing the Certificates, Agway took on an obligation to pay interest and principle to the purchasers of the Certificates. These purchasers therefore possessed a corresponding right to receive these payments. The instant suit plainly concerns Agway's failure to fulfill its obligations with respect to the Certificates and the plaintiffs' consequent deprivation of their rights with respect to the same. If this suit therefore does not solely involve a claim "that relates to the rights . . . and obligations relating to or created by or pursuant to" the Certificates, I am at a loss to understand why.[2]

## II. The Majority's Failed Effort to Deny the Applicability of Section 1332(d)(9)(C).

An odd feature of the majority's opinion is that it explicitly acknowledges the initial premise of the argument

---

[2] Although there are still few cases considering Section 1332(d)(9)(C), I note that one district court has held that the exemption applies in cases involving rights of payment to the holders of debt securities. See Genton v. Vestin Realty Mortg. II, Inc., 2007 WL 951838 at *3 (S.D. Cal. Mar. 9, 2007) ("Plaintiffs' . . . claims arise directly from Vestin Realty's alleged failure to pay Plaintiffs their pro rata share as security owners in Vestin as required by the Operating Agreement.").

31

just made.  That is, the majority writes that the Certificates "certainly create 'obligations,' and therefore corresponding 'rights' in the holders. . . . [T]he Certificates create rights in the holders to a rate of interest and to principle repayment at certain dates."  Opinion at 18-19.  But then the majority takes an idiosyncratic turn:

> But the present suit does not "relate[] to" those rights; rather, it is a state-law consumer fraud action alleging that Agway fraudulently concealed its insolvency when it peddled the Certificates.  Claims that "relate[] to the rights . . . and obligations" "created by or pursuant to" a security must be claims ground in the terms of the security itself, the kind of claims that might arise where the interest rate was pegged to a rate set by a bank that later merges into another bank, or where a bond series is discontinued, or where a failure to negotiate replacement credit results in a default on principal.  The present claim – that a debt security was fraudulently marketed by an insolvent enterprise – does not enforce the right of the Certificate holders as holders, and therefore it does not fall within § 1332(d)(9)(C) . . . .

Id. at 19.

Now there are a host of comments that could be made about this passage. For example, the phrase "Certificate holders as holders" seems to be without sense. Further, one wonders why a suit involving "a failure to negotiate replacement credit [which] results in a default on principal" would fall within the purview of Section 1332(d)(9)(C), but a suit, such as the present one, involving the fraudulent marketing of debt securities which results in a default on principal, does not. But the most important thing to be said about the passage is that it constitutes a wholly inexplicable departure from the plain text of Section 1332(d)(9)(C).

Thus, the majority's recitation of what claims "must be" in order to fall within the Section 1332(d)(9)(C) is purely its own invention. The terms of the Section itself merely say, <u>without qualification</u>, that claims which "relate[] to" the "rights" – <u>another term which is unqualified</u> – of securities holders are exempted from CAFA's scope. I can only conclude that the majority's specifications as to what claims "must be" in order to

33

qualify for exemption is an act of judicial re-drafting of CAFA. We frequently hear, however, that "legislating from the bench" is a cardinal sin of the judicial profession.

Further, the majority's assertion that this suit is "a state-law consumer fraud action" is of no moment. If the plaintiffs were challenging a bank merger, or the discontinuance of a bond series, or a failure to negotiate replacement credit, such actions would presumably be brought under state corporate law. But the terms of CAFA simply do not contain any indication that this distinction has any import whatsoever. Under those terms, all that matters is that the suit is one in which securities holders are seeking the enforcement of rights created by, or relating to, the securities they hold. If this condition is met, our inquiry is finished.

The majority's attempt to justify its eccentric reading of Section 1332(d)(9)(C) is left to rest upon dubious legislative intent. Specifically, it is noted that the Senate Report relating to the passage of CAFA "demonstrate[s] that Congress intended that § 1332(d)(9)(C)

34

. . . should be reserved for 'disputes over the meaning of the terms of a security,' such as how interest rates are to be calculated, and so on." Opinion at 23 (quoting S. Rep. 109-14, at 45 (2005)). But the majority acknowledges that "[t]his Circuit has expressed some skepticism as to the 'probative value' of [this] Senate Report because it was issued after CAFA's enactment . . . ." Id. at 22 (quoting Blockbuster, Inc. v. Galeno, 472 F.3d 53, 58 (2d Cir. 2006)). The majority appears to believe this skepticism is cured by the views of the Eleventh Circuit. Id. For my part, I believe that the Seventh Circuit fully justifies our skepticism with its observation that the report in question "has no more force [as a source of legislative intent] than an opinion poll of legislators – less really, as it speaks for fewer. Thirteen Senators signed this report and five voted not to send the proposal to the floor. Another 82 Senators did not express themselves on the question; likewise 435 Members of the House and one President kept their silence." Brill v. Countrywide Home Loans, Inc., 427 F.3d 446, 448 (7th Cir. 2005).

Far more importantly, the Senate Report's assertion that the scope of Section 1332(d)(9)(C) is limited to suits involving disputes over the terms of securities simply has no relation to the enacted text.  As already noted, that text unambiguously exempts from CAFA's reach suits involving claims of "rights . . . and obligations" "created by or pursuant to" a security and contains not a word suggesting that these terms are limited in the manner asserted by the majority.  In such circumstances, the Supreme Court has instructed us that it would be improper for us to consult legislative history as to the meaning of the statutory provision at issue:

> We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.  When the words of a statute are unambiguous, then, this first canon is also the last: the judicial inquiry is complete.

Connecticut Nat. Bank v. Germain, 503 U.S. 249, 253-254 (1992) (internal quotation marks omitted).[3]

---

[3]  I believe that it is important to note that the majority does not assert that the inapplicability of Section 1332(d)(9)(C) to this case has anything to do with the

36

# III.  A Concluding Observation.

Writing almost ninety ago, a wise and revered judge noted that statutes are "designed to meet the fugitive exigencies of the hour." Benjamin N. Cardozo, The Nature of the Judicial Process, 83 (1921).  Because they are enacted under such circumstances, he concluded that it sometimes happens that "gaps" appear between the statutory language and the facts presented by a given case.  In such situations, he asserted that judges, in order to reach decisions, have the discretion to apply the statutory language in a manner which effectively adds to or subtracts from the existing text as if the judge were acting as a legislator.  He cautioned, however, that judges should not get carried away in this regard:

---

merits of the plaintiffs' claims.  The majority is wise to avoid any such assertion.  Although it is true that CAFA was enacted upon an express finding by Congress that "there have been abuses of the class action device," 28 U.S.C. Section 1711(a)(2), the substantive terms of the statute are wholly jurisdictional; they afford the federal courts no authority to use CAFA as a vehicle for dismissing suits considered to be meritless.  In sum, we have only decided here that federal jurisdiction exists and we "remand [this] case to the district court for further proceedings," Opinion at 23, without any instruction as to how it should decide the merits of the plaintiffs' claims.

> In countless litigations, the law is so clear that judges have no discretion. They have the right to legislate within gaps, but often there are no gaps. We shall have a false view of the landscape if we look at the waste spaces only, and refuse to see the acres already sown and fruitful.

Id. at 129.

I believe the application of CAFA to the facts of the instant case leads to the straightforward conclusion that the district court correctly held that the case should be remanded to state court. In other words, no gap exists. By contrast, I believe that the majority has ignored the plain terms of CAFA, created its own waste space, and filled in the resulting gap with an unwarranted exercise of legislative power. I must therefore respectfully dissent.